IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

DAVID KELLAR,

        Plaintiff,

        v.                           Civil Action No. 5:06-CV-57

MICHAEL ASTRUE,
Commissioner of Social Security,

        Defendant.


**REPORT AND RECOMMENDATION**
**SOCIAL SECURITY**

**I.  Introduction**

A.    Background

    Plaintiff, David Kellar, (Claimant), filed his Complaint on May 10, 2006, seeking

Judicial review pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3) of an adverse

decision by Defendant, Commissioner of Social Security, (Commissioner).[1]  Commissioner filed

his Answer on August 10, 2006.[2]  Claimant filed his Motion for Summary Judgment on

September 11, 2006.[3]  Commissioner filed his Motion for Summary Judgment on October 4,

2006.[4]

B.    The Pleadings

    1.    Claimant's Motion for Summary Judgment.

---

[1] Docket No. 1.

[2] Docket No. 6.

[3] Docket No. 9.

[4] Docket No. 10.

2. <u>Commissioner's Motion for Summary Judgment</u>.

C.     <u>Recommendation</u>

I recommend that:

1.     Claimant's Motion for Summary Judgment be GRANTED IN PART and DENIED IN PART and the case REMANDED to Commissioner solely for consideration of whether Claimant was under a disability after he lost the use of his hearing aid.

2.     Commissioner's Motion for Summary Judgment be GRANTED IN PART and DENIED IN PART for the same reasons set forth above.

## II. Facts

A.     <u>Procedural History</u>

Claimant filed his application for Social Security Disability Insurance Benefits and Supplemental Security Income on September 8, 2003, alleging disability since August 15, 2003. The claim was denied initially and on reconsideration. Claimant requested a hearing before an ALJ and received a hearing on July 29, 2005. The ALJ issued a decision adverse to Claimant on August 18, 2005. Claimant requested review by the Appeals Council, but it denied this request on March 9, 2006. Claimant filed this action, which proceeded as set forth above.

B.     <u>Personal History</u>

Claimant was 39 years old on the date of the July 29, 2005 hearing before the ALJ. Claimant has a ninth grade education. He has prior relevant work experience as a baker and carpenter.

C.     <u>Medical History</u>

The following medical history is relevant to the time period during which the ALJ

concluded that Claimant was not under a disability: August 15, 2003 – August 18, 2005.[5]

**John M. Shamma'a, M.D., 3/29/02, Tr. 143**
Admitting diagnosis test: dysepsia and other functional disorder of the stomach

Secondary diagnosis test: atrophic gastritis, bacterial infection due to helicobacter pylori, duodenal ulcer, without hemorrhose or perforation, without mention of obstruction, esophagitis, tobacco use disorder

**John Shamma'a, M.D., 3/29/02, Tr. 146**
Impression: grade 2 erosive esophagitis, antral erosive gastritis, small duodenal bulb ulcer without bleeding signs

**John Shamma'a, M.D., 3/29/02, Tr. 149**
Final pathologic diagnosis: chronic active gastritis, H. pylori present

**Christopher Ervin, M.D., 11/12/02, Tr. 164**
Impression: no hydronephrosis, tiny bileral renal calculi, probable 2 mm non-obstructing calculus at right UVJ.

**Jeffrey T. Cook, M.D., 8/21/03, Tr. 184**
Indication: trauma

**Martin Levin, M.A., 11/24/03, Tr. 185**
WAIS-III
      Verbal IQ: 91
      Performance IQ: 92
      Full scale IQ: 91

The scores appear to be valid.

WRAT-III
      Reading: 86 (standard score), high school (grade score)
      Spelling: 83 (standard score), 7th grade (grade score)
      Arithmetic: 78 (standard score), 6th grade (grade score)

The WRAT-III reading score is consistent with the WAIS-III score.  However, the spelling and

---

[5] Much of the evidence in the record comes from before Claimant's alleged onset date of disability.  Evidence obtained prior to the alleged onset date may be relevant to the instant claim. See Tate v. Apfel, 167 F.3d 1191, 1194 n.2 (8th Cir. 1999); Burks-Marshall v. Shalala, 7 F.3d 1346, 1348 n. 6 (8th Cir. 1993); Williams v. Barnhart, 314 F. Supp. 2d 269, 272 (S.D.N.Y. 2004).

arithmetic scores are lower than would be expected.  It is possible the scores are lower due to depression.

Diagnosis:
Axis I: major depressive disorder, recurrent, moderate, alcohol abuse, in sustained full remission
Axis III: ulcers, hearing loss, balance problems, hepatitis C, gall stones, hiatal hernia, all as reported

Prognosis: guarded

**Psychiatric Review Technique, 12/10/03, Tr. 189**
The person has MDD.

Functional limitations and degree of limitation
      Restriction of activities of daily living, difficulties in maintaining social functioning, difficulties in maintaining concentration, persistence, or pace: mild
      Episodes of decompensation, each of extended duration: none

The evidence does not establish the presence of the "C" criteria.

**B.J. Kerbyson, D.O., 12/29/03, Tr. 203**
Impression: moderate obesity, hearing loss, history of hepatitis C, history of learning disorder and depression

**Physical Residual Functional Capacity Assessment, 2/10/04, Tr. 217**
Exertional limitations
      Occasionally lift and/or carry 50 pounds
      Frequently lift and/or carry 25 pounds
      Stand and/or walk for a total of about 6 hours in an 8 hour work day
      Sit for a total of about 6 hours in an 8 hour work day
      Push and/or pull: unlimited

Postural limitations
      Climbing ramps/stairs, balancing, stooping, kneeling, crouching, crawling: frequently
      Climbing ladders/ropes/scaffolds: never

Manipulative limitations: none establishes
Visual limitations: none established

Communicative limitations
      Hearing: limited
      Speaking: unlimited

Environmental limitations

Wetness, humidity, vibration, fumes, odors, dusts, gases, poor ventilation: unlimited
Extreme heat, extreme cold: avoid concentrated exposure
Noise: avoid even moderate exposure
Hazards: avoid all exposure

(Signature illegible), (Undated), Tr. 226
Diagnosis: bilateral (illegible), profound left loss, severe right loss

Prognosis: stable to slowly worsening

**(Signature illegible), 3/23/04, Tr. 228**
Diagnosis: otosclerosis

Prognosis: poor

**Lance D. Dubberke, M.D., 4/5/04, Tr. 229**
Impression: stress test report as per Dr. Seetha Ginjupalli, no significant reversible ischemia, normal left ventricular systolic function with ejection fraction of about 60 percent with no obvious significant regional wall abnormality

**Lance D. Dubberke, M.D., 3/23/04, Tr. 231**
Assessment: chest pain, gastritis history, health screening, history of depression, acute bronchitis, early pneumonitis

**Lance D. Dubberke, M.D., 3/23/04, Tr. 241**
Impression: density overlying the region of the lingula at the level of the cardiac apex, probably related to the pericardial fat pad rather than pneumonia

**Physical Residual Functional Capacity Assessment, 5/20/04, Tr. 247**
Exertional limitations
Occasionally lift and/or carry 50 pounds
Frequently lift and/or carry 25 pounds
Stand and/or walk for a total of about 6 hours in an 8 hour work day
Sit for a total of about 6 hours in an 8 hour work day
Push and/or pull: unlimited

Postural limitations
Climbing ramps/stairs, ladder/rope/scaffolds: Both frequently and never are checked.  It is unclear which designation applies to which climbing abilities.
Balancing, stooping, kneeling, crouching, crawling: frequently

Manipulative limitations: none established
Visual limitations: none established

Communicative limitations
>Hearing: limited
>Speaking: unlimited

Environmental limitations
>Extreme cold, extreme heat, wetness, humidity, vibration, fumes, odors, dusts, gases, poor ventilation: unlimited
>Noise: avoid even moderate exposure
>Hazards: avoid concentrated exposure

**(Unsigned), 12/29/03, Tr. 255**
Impression: moderate obesity, hearing loss, Hx of hepatitis C, Hx of LD and depression

**Psychiatric Review Technique, 6/5/04, Tr. 256**
Medical disposition: impairment not severe

The person has major depression.

Functional limitation and degree of limitation
>Restriction of activities of daily living, difficulties in maintaining social functioning, difficulties in maintaining concentration, persistence or pace: mild
>Episodes of decompensation, each of extended duration: none

The evidence does not establish the presence of the "C" criteria.

**(Unsigned), 10/27/03, Tr. 292**
Diagnostic impression: pharyngitis

**(Unsigned), 8/4/04, Tr. 299**
Diagnostic impression: blunt trauma to the head/closed head injury, C spine strain, lumbar spine strain

**Lance D. Dubberke, M.D., 12/01/04, Tr. 308**
Assessment: probable kidney stones

**Lance D. Dubberke, M.D., 11/18/04, Tr. 310**
Assessment: hepatitis C, strong history of depression , sinusitis

**Lance D. Dubberke, M.D., 11/8/04, Tr. 311**
Assessment: acute sinusitis, hepatitis C

**Lance D. Dubberke, M.D., 9/10/04, Tr. 312**
Assessment: post concussion syndrome

**Lance D. Dubberke, M.D., 8/16/04, Tr. 313**
Assessment: post concussion syndrome

**Shawn Long, M.D., 7/26/04, Tr. 314**
Assessment: renal colic with hematuria, most likely current nephrolithiasis versus recently passed stone

**Shawn Long, M.D., 7/22/04, Tr. 315**
Assessment: renal colic

**(Signature illegible), 6/2/04, Tr. 317**
The patient has a triceps strain on the right.

**Lance D. Dubberke, M.D., 5/25/04, Tr. 318**
Assessment: triceps strain

**Lance D. Dubberke, M.D., 12/1/04, Tr. 322**
Impression: right renal stone, non-specific pelvic calcifications

**Lance D. Dubberke, M.D., 2/17/05, Tr. 328**
Assessment: viral upper respiratory infection, abdominal pain, though improved

**Lance D. Dubberke, M.D., 2/10/05, Tr. 329**
Assessment: right upper quadrant pain

**Lance D. Dubberke, M.D., 1/5/05, Tr. 331**
Assessment: patellar tendonitis

**Lance D. Dubberke, M.D., 12/4/04, Tr. 333**
Impression: tiny bilateral renal calculi.  There is no hydroureter noted.  A tiny calcification in the distal right pelvis is suspected to be a phlebolith, but it would be difficult to completely exclude a small right distal ureteral calculus.

**Michelle Lovett, CFNP, and John Shamma'a, M.D., 3/7/05, Tr. 341**
Impression: the patient is asymptomatic with chronic hepatitis C virus infection.  This is complicated by a substantial previous history of psychiatric disorder.

**E. Sam Guy, M.D., 3/19/05, Tr. 347**
Admission diagnosis: mood disorder

Discharge diagnosis:
Axis I: mood disorder, nicotine dependence, marijuana abuse, post-traumatic stress disorder, history of sexual abuse
Axis II: personality disorder

Axis III: hypertension, gastroesophageal reflux disease, legally deaf
Axis IV: lack of support system, psychosocial stressors severe, chronic mental illness secondary to employment and relationship problems
Axis V: GAF on admission 45, discharge 55

**E. Sam Guy, M.D., 3/14/05, Tr. 349**
Assessment:
Axis I: mood disorder, nicotine dependence, marijuana abuse, post-traumatic stress disorder, history of sexual abuse
Axis II: personality disorder
Axis III: hepatitis C, gastroesophageal reflux disease, legally deaf
Axis IV: lack of support system, psychosocial stressors severe, chronic mental illness, economic, employment, relationship problems
Axis V: GAF 45

**E. Sam Guy, M.D., 3/16/05, Tr. 352**
Impression:
Axis I: mood disorder, intermittent explosive disorder (provisional)
Axis III: hepatitis C
Axis IV: family stressors and family conflict
Axis V: GAF 50

**Kyle B. McLeod, M.D., 3/14/05, Tr. 362**
Diagnosis: depression

**Gerardo C. Lopez, M.D., 4/14/05, Tr. 387**
Impression: chest pain possibly angina with increased frequency, multiple risk factors for heart disease, dyslipidemia

**Gerardo C. Lopez, M.D., 4/19/05, Tr. 389**
Impression: no evidence of any significant coronary disease, though there are some minor irregularities, non-cardiac chest pain

**Lance D. Dubberke, M.D., 3/8/05, Tr. 392**
Impression: mild early degenerative changes but otherwise unremarkable lumbar spine series

**Lance D. Dubberke, M.D., 2/20/04, Tr. 393**
Impression: non-obstructing right renal calculi

**Lance D. Dubberke, M.D., 12/4/04, Tr. 394**
Impression: tiny bilateral renal calculi.  There is no hydroureter noted.  There is tiny right calcification in the distal right pelvis that is suspected to be a phlebolith, though it would be difficult to exclude completely a small right distal ureteral calculus.

**Lance D. Dubberke, M.D., 5/9/05, Tr. 395**
Assessment: tobacco addiction, degenerative joint disease

**Lance D. Dubberke, M.D., 4/11/05, Tr. 396**
Assessment: thumb sprain

**Lance D. Dubberke, M.D., 3/8/05, Tr. 397**
The patient has a history of back pain. There are chronic problems by history, though there is no atrophy or nerve loss. There is a family history of heart disease with peripheral vascular disease noted by X-ray, a history of hepatitis, and is a hepatitis C carrier.

**Michelle Lovett, CFNP and John Shamma'a, M.D., 7/27/05, Tr. 403**
Assessment: hepatitis C genotype 1, nausea, vomiting and abdominal pain

**John Shamma'a, M.D., 7/5/05, Tr. 415**
Impression: the patient has grade II or grade C esophagitis, deformity in the prepyloric antrum suggestive of previous ulcer disease, and gastric emptying evidenced by large amounts of solid, particulate and thick liquid residual.

**John Shamma'a, M.D., 7/5/05, Tr. 418**
Final pathologic diagnosis: reflux esophagitis

D.    <u>Testimonial Evidence</u>

Testimony was taken at the July 29, 2005 hearing. The following portions of the testimony are relevant to the disposition of the case.

[EXAMINATION OF CLAIMANT BY ALJ]

Q    When you have a hearing aid, does it help the hearing in your right ear?

A    As long as there's no background noise, I can hear some, as long as there's no background noise. If there's background noise, I can't hear nothing. I, I can't make out what people are saying or anything.

Q    So, with the hearing aid, you would be able to hear conversation if there was no background noise?

A    I wouldn't catch all of it, but I could catch the biggest part of it. Even with the

9

hearing aid, I have problems hearing.  I've got, you know, I can't catch everything that's said.  If someone's got a low voice, I can't make out what they're saying.  If they got a deep voice, I can make it out.

*          *          *

Q      So what, when you say you have problems with your temper.

A      Yes, ma'am.

Q      Okay.  So do you become violent?

A      I just lose control.

Q      And what happens when you lose control?

A      Usually I tear up whatever's in front of me.  I just, I blow my top.  A lot of times I turn the anger on myself.

Q      What do you mean by that?

A      Well, that's what happened with me with my suicide, trying suicide, I turned the anger on myself.

Q      Is that something, that's been some time ago?

A      Yes, ma'am.

Q      Is that something that still occurs in some way?

A      I think about it, suicide, I do think about it.  I mean, there's been times that I been so mad and angry and depressed that I, I thought about it, had the pills there to do it, and I just walked away, you know, and tried to calm down.  Left for a few days, tried to get away from the situation.

Q      Is that something you do very, how often do you walk away and maybe go away

for a couple days?

A      Well, leaving for a couple days haven't been for a while, but walking away, it happens quite often now. I'll go take a walk in the woods or take a walk somewhere or I'll take the car and go somewhere, just try to calm down.

Q      Is that something that your doctors recommended that you - -

A      Yes.

Q      - - try?

A      Yes, ma'am.

Q      Does it help?

A      At times.

*        *        *

[EXAMINATION OF CLAIMANT BY HIS ATTORNEY]

Q      Now, I want to talk to you about you, about your daily activities, what you do during the day. Excuse me. What time do you go to bed at night?

A      Well I take my medicine about 9:00 but it, when I go to bed, I'm usually up lying in bed after midnight. I've seen, go all night that I haven't, couldn't go to sleep or nothing like that.

Q      How often do you have nights like that?

A      More often now than normal.

Q      Let's say an average week or an average month.

A      Average month, I mean, there's been times that I don't sleep at all.

Q      So in an average month, how often will that happen that you don't sleep at night?

A       At least two weeks out of a month.

Q       So, what time, once you get to sleep, do you stay asleep?

A       There's at times I can sleep all night.

Q       So on average, how many hours of sleep do you believe you get?

A       From four to five hours a night.

Q       And what time do you get up in the morning?

A       Well, that's the thing, I usually sleep in the morning a little bit until about 9:00, 9:30 in the morning, then I get up.

Q       Okay.  And what do you do with, when you get up in the morning, what kinds of things do you do?

A       I help my wife straighten up the house, help her take care of the kids, maybe go out in the yard and straighten up the yard or mow the grass, something like that, and then 2:00, 2:30, I take my wife to work and then I have my two sons from then on until she gets home from work, which is about 9:00, 9:30 at night, so I care for my kids 2:30 until 9:30.

Q       And generally, are you able to do those types of things while you're at home without problems that you've described today?

A       Well, the thing is, if I, my children, I can't hear my children, and you know, I, that affects life at home too because they want something, I can't hear what they're saying, I can't understand what they're saying.  A lot of times they want to go outside and play in the pool and stuff like that, and I go outside and I can't breathe, usually I got to lay down on the couch or something. I don't go to sleep but I got to lay down on the couch or something.  I don't go to sleep but I got to lay down, relax and all that, my stomach, my head, usually I got headaches in

the evenings and stuff, and I try to get rid of the headache.

Q       Do you do that all during the, do you do that at all during the day?  You have to lie down during the day?

A       Very seldom do I ever lay down through the day.  And if it is, it's only for like an hour or so, tops, hour to hour-and -a-half, tops.

Q       Now, are you able to tolerate your children without problems from the - -

A       Well I, I get, you know, I get aggravated but you tell me one person don't get aggravated at their kids.  I mean, I get aggravated with them.  My two boys are ornery.  I yell a lot.  I don't whip them, but I yell a lot.  I make them sit down and make them go to their room.  Like I said, I don't whip my kids.  Very seldom do I ever whip my children.  I grew up from an abusive family with my dad and my mom both, and I swore I'd never be like with my kids.

Q       Now do you visit with other people?

A       Pardon me?

Q       Do you visit with other people?

A       I, I go two places.  A buddy of mine named Jerry, and once in a while I go to Tim's, another friend.  Very seldom though.

Q       How often do you see one of those two folks?

A       At least once a week.

Q       And what do you do when you go over?

A       Just talk, BS back and forth with them.

Q       Now, do you have any hobbies?

A       No.  I don't.  A lot of people said fishing and hunting.  I, I can't hunt no more

because I can't hear. I bought my hunting and fishing license. I very seldom ever fish. Once in a blue moon I'll go fishing.

Q        Did you hunt last fall?

A        Pardon me?

Q        Did you hunt last fall?

A        Very seldom.

Q        How many times did you go out?

A        Maybe four. The thing is I can't hear, I can't trust the other hunters. My eyes can only see so much.

Q        And what about fishing?

A        I been fishing twice this year.

Q        Do you go to church or have other activities?

A        No.

Q        Excuse me.

A        Me and my wife just talked about that, take, getting the kids involved in church and all that, but we haven't done it yet.

Q        Do you have any other problems that we haven't talked about?

A        I got a problem with my balance. I don't know what's going on with it. Like I've said, they wanted to do an MRI on that to see if there's anything wrong with my brain or, but I ache a lot. My knees hurt, my elbows hurt, my shoulder hurts. I've talked to Dr. Shamal and asked him if this disease attacked joints. He said he couldn't tell me yes, but he couldn't tell me no. He, he didn't know. And he said it was a possibility.

Q        Let, let's talk about your balance for a minute.  What kinds of problems do you have with your balance?

A        Well, when I stand up, I fall back down or I stagger like I've been drinking or something like that.

Q        Like if you get up from a sitting position to a standing position?

A        I, I'll, once in a while I'll like fall back down.  There's times that my wife's got to help me up onto my feet.  When I first get up in the morning, I can't just jump out of bed and stand up.  I've got to gradually get up, sit on the edge of the bed until I get my mind clear and stuff like that, then I can get up.

Q        All right.  Do you have any problems with sitting?

A        Well, I got kidney stones and I can't sit for a long period in one position, I got to move around and stuff or my lower back will hurt.

Q        Okay.  And how long, excuse me, how long typically are you able to sit before you need to get up?

A        Well, I feel like getting up now, right now, I'm wanting to stand up, but - -

Q        Well, you can, I mean, if you need to stand up, you can - -

A        No, I'm okay.

Q        - - stand up.

A        I'm okay right now.

Q        Okay.  So, we've been in here half an hour, 35 minutes.

A        Yeah, half hour, 35 minutes, 45 minutes, I got to get up and move.  I got to - -

Q        Okay.

A        - - stand up or move.

Q        What about standing?  Do you have any difficulty with standing other than the balance problem that described?

A        Well, like I said, my knees.  Okay, they hurt when I stand.  We have steps in my house.  I have problems going up and down the steps.  Like, you know, just stepping down on the knee itself, on my - -

Q        What, which knee - -

A        - - left knee.

Q        - - bothers you.

A        My left knee.

                          *                    *                    *

Q        Now, does, does walking cause you any problem?

A        Well, been, like I said, it's the knee, you know, I, I got a limp once in a while with that basically is, you know, putting pressure down on that knee.  If I try to lift, the tension in the knee and the shoulders, it just, it don't go.

Q        How much typically are you able to lift?

A        Oh, I don't know here lately.  I, I haven't been really lifting anything.

Q        Can you carry a bag of groceries?

A        Yeah, a bag of groceries.  I can help, help my wife when we go to the grocery store.

Q        Are you, what chores are you able to do in your home?

A        Pardon me?

Q      What chores?

A      Once in a while, I help my wife cook dinner, help her do dishes, just sweep, run the vacuum cleaner, make the bed, clean up after the boys.

Q      What is it, do you, which problem do you think interferes the most with your ability to work on a full-time job?

A      Well, I've lost a job because of Hepatitis C.  I've also lost a job because of my hearing.  Everybody says I'm too big of a risk factor.  I've had, like I said, I've had jobs doing carpentry work and stuff like that.  If I'm in a room like, like I said, I used to do drywall, there's hammering and stuff like that, I can't hear over that hammer and where's material running, machinery running and stuff like that.  My balance, I've had a problem with it.  I fell and broke both wrists, which I wore a cast on my right arm and brace on my left arm.

Q      Um-huh.

A      Tried to go back to work, I couldn't use my hand, [INAUDIBLE] that.

Q      Do you, do you think the, the depression and the temper would create any problems in - -

A      Yeah.

Q      - - a work environment, or is that just something that you're able to - -

A      Well, I'm not going to lie to you.  It, it aggravates me because of my hearing.  If I don't hear what people say, I ask them to repeat theirself, and a lot of times, they get agitated with that, you know, if I can't hear somebody, if they want me to do a job, if I can't hear how they want it done, you know, how can I, I do my job to the best of my performance.  If, like with drywall work and stuff like that, basically, I was left alone, but now and then somebody come in

there and irritate me or something like that, I busted drywall, had to replace it.

\*                    \*                    \*

BY ADMINISTRATIVE LAW JUDGE:

Q       How'd you spend yesterday?

A       How'd I spend yesterday?

Q       Um-huh.  I know you're taking care of your boys.

A       Well, I got up about 9:00, 9:30, I took my medicine, me and wife straightened up the house and about 1:30, quarter to 2:00, went to Fairmont, see my lawyer, left there, took my wife to work, come back home with the children, my mother-in-law watched one of my sons while the other son went with me, we went to my brother's house, try to find tires for my car so I can make it here this morning.

Q       Mr. Kellar, what were you doing in a demolition derby at the fair?

A       Stupidity put me in it.

Q       I mean, you're, you're being kind of inconsistent with - -

A       Pardon me?

Q       It's kind of inconsistent with your symptoms if you felt good enough to go to a demolition derby, you can't hear - -

A       Well, it was - -

Q       - - you're telling me.

A       It was something that I , I wanted to do, always wanted to do.  I went out there with no plans in running it, but the driver was supposed to been for the car got hurt, somebody said you run it, I jumped in the car, didn't think nothing about it, tried it.

Q       Was this at the Mannington Fair?

A       Yes, sir.

Q       Do you all take the boys to places like that?  Fairs and - -

A       Yes, sir, if we can afford it.

Q       - - do you take your boys fishing?

A       Pardon me?

Q       Do you take your boys fishing?

A       Yes, sir.

Q       How much sleep are you getting?

A       I'm getting a rough guess about four to five hours sleep a night.

Q       Okay.  Mr. Kellar, was your hearing the same as it is today when you were working as a baker?

A       No.

Q       It's worse?

A       Yes.

Q       Because you lost your hearing aid?

A       Well, I, I think that, the thing is at the baker when I worked there, it, normally, most of the time, I was there by myself.

Q       Okay.

A       So I didn't have to deal with people for nothing there.  Most of the time, I was there by myself.  My aunt would come in later.  It was my aunt's bakery.  I'd go down and get stuff started then she'd come in later, and then after the, the donuts were ready to be shipped, she

left, and I was left there at the bakery to clean the bakery and stuff like that.

                    *               *               *

EXAMINATION OF VOCATIONAL EXPERT BY ADMINISTRATIVE LAW JUDGE:

Q        Sir, how would you describe the claimant's past work?

A        Past work as a baker, Your Honor, exertional level is medium, skill level is skilled. Work as a driver for American Paving, exertional level was light, skill level was semi-skilled. Work as a carpenter and drywaller, finisher, exertional level is medium, skill level is skilled.

Q        Please assume a younger individual with a ninth-grade education; precluded from performing all but sedentary work; in a controlled environment free of pollutants; no hazards such as dangerous and moving machinery, unprotected heights; work that is unskilled and low stress, defined as one- and two-step processes; routine and repetitive tasks; primarily working with things rather than people; entry level, entry level; and work with a low level of background noise. With those limitations, can you describe any work?

A        Under the sedentary level, Your Honor, addresser, stuffer, 240,000 nationally, 2,000 regionally; general sorter, 25,000 nationally, 900 regionally; and because the hypothetical includes a low level of background noise and no hazards like dangerous machinery or anything, I've reduced those numbers in half, Your Honor.

Q        Are those jobs consistent with the DOT?

A        Yes, they are, Your Honor.

Q        What if because of what Dr. McClure says the claimant cannot stay on task one-third to two-thirds of the time, are those jobs affected?

A       If the individual was not, could not stay on task one-third to two-thirds of the time, Your Honor, those jobs would be eliminated.

RE-EXAMINATION OF CLAIMANT BY ADMINISTRATIVE LAW JUDGE:

Q       Mr. Kellar, I didn't ask you how much you drive during the week.

A       A week?

Q       Do you have any idea?

A       I drive from Kingston to Clarksburg.

Q       What is that, ten, five miles?

A       It's eight miles one way.

Q       How much?

A       Eight miles.

Q       Where do you go in Clarksburg?

A       I take my, drive my wife to work because she doesn't have a driver's license.

Q       So you go pick her up too then?

A       Yes, sir.

Q       So you go 32 miles a day then?

A       Right about that.

Q       About there?  And then when you go to your friends' house, do you walk or do you drive?

A       At times I walk, try to get the exercise and times I drive.  It's only like a mile.  I got one friend that lives about a half a mile from me.

Q       Okay.    I just wanted to get that on the record.

ALJ          And go ahead, Ms. Carpenter.

EXAMINATION OF VOCATIONAL EXPERT BY ATTORNEY:

Q        If the time off task were even one hour during the day, outside of breaks and lunch periods, how would that affect the ability to work?

CLMT        Pardon me?

VE          Individual - -

ATTY        I'm talking to him.

VE          - - there would be no jobs available.

*          *          *

E.        Lifestyle Evidence

The following evidence concerning the Claimant's lifestyle was obtained at the hearing and through medical records.  The information is included in the report to demonstrate how the Claimant's alleged impairments affect his daily life.

•    Can shave by himself (Tr. 94)

•    Prepares sandwiches, mashed potatoes, and eggs (Tr. 95)

•    Takes out the trash (Tr. 95)

•    Watches television three to four hours per day (Tr. 96)

•    Tobacco abuse (Tr. 143)

•    Visits his next door neighbor (Tr. 188)

•    Obesity (Tr. 206)

•    Marijuana abuse (Tr. 350)

•    Hunted four times in the year prior to the administrative hearing (Tr. 454)

- Goes fishing (Tr. 454)

- Can carry a bag of groceries (Tr. 458)

- Participated in a demolition derby (Tr. 463)

- Drives 32 miles per day (Tr. 467)

- Walks a mile to a friend's house (Tr. 468)

### III. The Motions for Summary Judgment

A.     Contentions of the Parties

Claimant contends that the ALJ's decision is not supported by substantial evidence. Claimant makes only one assignment of error. He argues the ALJ gave insufficient consideration in the evaluation of Claimant's credibility. Claimant argues the ALJ should have more thoroughly analyzed the evidence. He also contends that of the little evidence the ALJ did consider, the ALJ did not evaluate it in a proper manner.

Commissioner maintains that the ALJ's decision was supported by substantial evidence. Commissioner contends the ALJ properly considered the evidence to find Claimant's allegations less than fully credible.

B.     The Standards.

1.     Summary Judgment. Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). All inferences must be viewed in the light most favorable to the party

opposing the motion.  Matsushita Elec.  Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." Anderson v.  Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

2.      Judicial Review.  Only a final determination of the Commissioner may receive judicial review.  See, 42 U.S.C. §405(g), (h); Adams v. Heckler, 799 F.2d 131,133 (4th Cir. 1986).

3.      Social Security - Medically Determinable Impairment - Burden. A claimant bears the burden of showing that he has a medically determinable impairment that is so severe that it prevents him from engaging in any substantial gainful activity that exists in the national economy.  42 U.S.C. § 423(d)(1), (d)(2)(A); Heckler v. Campbell, 461 U.S. 458, 460 (1983).

4.      Social Security - Medically Determinable Impairment.  The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques.  42 U.S.C. § 423(d)(1), (3); Throckmorton v. U.S. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

5.      Disability Prior to Expiration of Insured Status- Burden.  In order to receive disability insurance benefits, an applicant must establish that he was disabled before the expiration of his insured status.  Highland v. Apfel, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(i), 423(c); Stephens v. Shalala, 46 F.3d 37, 39 (8th Cir.1995)).

6.      Social Security - Standard of Review.  It is the duty of the ALJ, not the courts, to

make findings of fact and to resolve conflicts in the evidence. The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the court's judgment for that of the Secretary. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

      7.    Social Security - Scope of Review - Weight Given to Relevant Evidence. The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry." Milburn Colliery Co. v. Hicks, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence. Gordon v. Schweiker, 725 F.2d 231, 235-36 (4th Cir. 1984).

      8.    Social Security - Substantial Evidence - Defined. Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

      9.    Social Security - Sequential Analysis. To determine whether a claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether the claimant is currently employed, 2) whether he has a severe impairment, 3) whether his impairment meets or equals one listed by the Secretary, 4) whether the claimant can perform his past work; and 5) whether the claimant is capable of performing any work in the national economy. Once the claimant satisfies Steps One and Two, he will automatically be found disabled if he suffers from a listed impairment. If the claimant does not

have listed impairments but cannot perform his past work, the burden shifts to the Secretary to show that the claimant can perform some other job.  Rhoderick v. Heckler, 737 F.2d 714-15 (7th Cir. 1984).

C.      Discussion

The ALJ's Consideration of Claimant's Credibility

Claimant only argues the ALJ erred in considering Claimant's credibility.  Claimant makes two arguments under this heading.  First, Claimant contends the ALJ failed to sufficiently evaluate the evidence before finding the impairments Claimant alleged less than fully credible. Claimant argues the ALJ only considered his daily activities in making his credibility evaluation and the ALJ should have evaluated other evidence.  Second, Claimant argues the ALJ made an erroneous evaluation of his daily activities.  Commissioner disputes these claims.  He argues the record shows the ALJ fully and properly considered the evidence before making a determination about Claimant's credibility.  The ALJ's factual decisions are reviewed only for substantial evidence and his legal decisions de novo.  Milburn Colliery Co., 138 F.3d at 528.

A.

The Sufficiency of the ALJ's Evaluation of the Evidence in His Credibility Assessment

The Fourth Circuit stated the standard for evaluating a claimant's subjective complaints in Craig, 76 F.3d at 585.  Under Craig, when a claimant alleges disability from subjective symptoms, he must first show the existence of a medically determinable impairment that could cause the symptoms alleged.  Id. at 594.  The ALJ must "expressly consider" whether a claimant has such an impairment.  Id. at 596.  If the claimant makes this showing, the ALJ must consider all evidence, including the claimant's statements about his symptoms, in determining whether

the claimant is disabled.  Id. at 595.  While the ALJ must consider the claimant's statements, he

need not credit them to the extent they are inconsistent with the objective medical evidence or to

the extent the underlying objective medical impairment could not reasonably be expected to

cause the symptoms alleged.  Id.  However, subjective symptoms "may not be dismissed merely

because objective evidence of the pain itself . . . are not present to corroborate the existence of

pain."  Id.

The ALJ satisfied the first step of Craig by expressly considering whether Claimant has

impairments that could cause the symptoms alleged.  Id. at 596.  The ALJ stated that "The

claimant has the aforementioned severe physical impairments that could reasonably be expected

to produce symptoms of he [sic] nature alleged, but not of the intensity or duration alleged by the

claimant."  (Tr. 19) (citations omitted).  Claimant has not challenged the ALJ's application of the

law at this step.

The ALJ also evaluated a significant amount of evidence at the second step of the Craig

inquiry.  As Claimant admits, the ALJ discussed Claimant's activities of daily living.  (Id.).

Craig provides that "evidence of the claimant's daily activities" should be considered.  Craig, 76

F.3d at 595.  Evidence of daily activities may show a person is not disabled.  Hunter v. Sullivan,

993 F.2d 31, 35 (4th Cir. 1992).  The ALJ stated that "He engages in significant daily activities

as detailed above, including driving his wife to work, taking care of his children, doing

household chores, hunting, fishing and visiting friends.  He was even driving a car in a

demolition derby at a fair in August 2004."  (Tr. 19).  The record supports these activities.  (Tr.

452-54, 463, 467).  Indeed, Claimant testified he cares for his two sons for seven hours per day.

(Tr. 453).  He visits friends at least once a week.  (Tr. 454).  He went hunting four times and

went fishing twice in the year prior to the administrative hearing. (Id.). Claimant drives thirty two miles per day. (Tr. 467). Claimant decided to participate in a demolition derby out of an impulsive instinct. (Tr. 463). The ALJ was entitled to consider this evidence as tending to show Claimant was not disabled. Hunter, 993 F.2d at 35.

Although Claimant argues the ALJ failed to consider evidence besides Claimant's activities of daily living, the Court finds this argument without merit. Immediately after discussing Claimant's activities of daily living, the ALJ stated he gave controlling weight to the opinion of Dr. Dubberke, Claimant's treating doctor. (Tr. 19). Dr. Dubberke stated Claimant could perform sedentary work. (Tr. 19, 339). He stated Claimant had no "neurologic deficits, myopathy, or atrophy signs" and no strength impairment. (Tr. 339). Claimant had the ability to "sit, stand, and walk reasonably well." (Id.). It was proper for the ALJ to give controlling weight to the opinion of Claimant's treating physician. Johnson v. Barnhart, 434 F.3d 650, 654 (4th Cir. 2005) (stating that "Courts often accord 'greater weight to the testimony of a treating physician' because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant").

The ALJ also considered Claimant's mental impairments. (Tr. 18-20). The ALJ noted Claimant's treating mental health physician determined Claimant suffered from "major depression, impulsive control disorder and panic disorder." (Tr. 18, 337). The ALJ also noted this physician stated he did not believe Claimant could maintain gainful employment due to his mental impairments. (Tr. 18, 337). Yet due to the wide range of Claimant's daily activities, the ALJ declined to credit the opinion that Claimant cannot sustain any work. (Tr. 19-20). The ALJ determined Claimant's mental impairments posed only moderate limitations. (Tr. 18). The

impairments did not prevent him from simple, sedentary work. (Tr. 19). The ALJ was not required to credit a physician's opinion as to legal disability where other evidence indicated the Claimant was not disabled, as here. 20 C.F.R. § 404.1527(e)(1).

Furthermore, the ALJ evaluated Claimant's hearing loss. (Tr. 18-19). The ALJ noted Claimant had significant hearing loss. (Tr. 18). The ALJ correctly stated Claimant's hearing loss was "severe to profound." (Tr. 18, 417).

However, the ALJ partially erred in his evaluation of Claimant's testimony regarding hearing impairments. Claimant testified his hearing impairments cause him significant difficulty in finding work. (Tr. 459). Claimant testified he is deaf in his left ear. (Tr. 442). He testified he can hear some things in his right ear with a hearing aid as long as there is no background noise. (Tr. 443). He stated he cannot hear anything when there is background noise, even with a hearing aid. (Id.). Claimant stated he especially has difficulty hearing persons with low voices. (Tr. 444). Claimant had a hearing aid, but does not have funds to replace it. (Tr. 443). The ALJ correctly stated Claimant is deaf in his left ear and has hearing loss in his right ear. (Tr. 19). He also mentioned Claimant had a hearing aid that broke and that Claimant cannot afford to replace it. (Id.). The ALJ then stated Claimant testified "he can barely hear without background noise but that with background noise he cannot hear at all." (Id.). This correctly related Claimant's testimony regarding his ability to hear with a hearing aid. When the ALJ determined Claimant's residual functional capacity, he limited him to work with low background noise, presumably finding Claimant credible regarding his ability to hear with a hearing aid. (Tr. 20).

Yet the ALJ should have separately evaluated the credibility of Claimant's limitations in hearing without his hearing aid. Where a person has limitations that may improve with

29

treatment, but the person cannot afford that treatment, the ALJ may not penalize the person for his lack of means.  Lovejoy v. Heckler, 790 F.2d 1114, 1117 (4th Cir. 1986).  In this case, there appears to be no dispute that Claimant's hearing condition could improve with a hearing aid, but Claimant's hearing aid broke and he cannot afford a replacement.  (Tr. 19, 443).  Therefore, the ALJ should have evaluated the severity of Claimant's alleged limitations in hearing without the hearing aid.  It is possible Claimant qualifies for disability benefits without his hearing aid, but not with his hearing aid.  Cf. Bailey v. Chater, 68 F.3d 75, 79-80 (4th Cir. 1995).  Yet the ALJ only considered Claimant's testimony about his limitations in hearing with the hearing aid.  This was error.

Based on foregoing analysis, the Court concludes substantial evidence supports the ALJ's credibility determination up to the time Claimant lost the use of his hearing aid.  The precise date Claimant lost the use of his hearing aid is unclear.  (Tr. 443).  After that time, substantial evidence is lacking.  Therefore, this case should be remanded to Commissioner to determine the whether Claimant is under a disability after the time he lost his hearing aid and, if so, the date such disability began.

### B.

#### The ALJ's Evaluation of Claimant's Daily Activities

The Court disagrees with Claimant's argument that the ALJ erred in relying upon Claimant's daily activities because they are not as significant as the ALJ makes them seem to be. Claimant argues the ALJ should not have considered that Claimant drives his wife to work since his wife is the only household member working and the family needs her income to survive. Pl.'s Br. at 11.  He also argues the small number of times he has been hunting and fishing fail to

demonstrate a significant level of ability.  Id.  Claimant states that although he cares for his children, the ALJ ignored that he also has difficulty with this due to hearing loss.  Id.  Finally, Claimant argues the ALJ erred in considering Claimant's participation in a demolition derby since he admitted it was a stupid thing to do and did it only to fulfill a lifelong dream.  Pl.'s Br. at 11-12.

As mentioned above, when evaluating a claimant's credibility regarding subjective limitations, the ALJ should consider evidence of daily activities.  Craig, 76 F.3d at 595. Evidence of significant daily activities may show a claimant is not disabled.  Hunter, 993 F.2d at 35.

The explanations offered by Claimant against consideration of the activities he has undertaken in the record do nothing to negate the fact that he retains the ability to perform those activities; therefore, they are proper for consideration in determining Claimant's credibility. Although Claimant argues he only drives his wife to work because his family needs the money, the fact that he does this still shows he has the ability.  (Tr. 441, 452-53, 467).  Similarly, the ALJ was entitled to consider that Claimant has gone hunting and fishing, even if he has not performed this activity on a frequent basis.  (Tr. 454).  Claimant retains the ability to perform these activities.  While Claimant contends the ALJ should have considered how his hearing and mental impairments affect his ability to care for his children, the ALJ did consider these limitations separately.  (Tr. 18-20, 453).  The ALJ was entitled to view Claimant's seven hour per day child care as mitigating against disabling symptoms.  (Tr. 453).  Finally, it is irrelevant that Claimant stated his participation in a demolition derby was stupid and only done to fulfill a lifelong fantasy.  (Tr. 463).  Claimant had the ability to drive in the derby.  Therefore, the ALJ

31

could consider this evidence in determining whether Claimant's symptoms were credible. Claimant's arguments of error in this regard should be rejected.

## IV. Recommendation

For the foregoing reasons, I recommend that:

1. Claimant's Motion for Summary Judgment be GRANTED IN PART and DENIED IN PART and the case REMANDED to Commissioner solely for consideration of whether Claimant was under a disability after he lost the use of his hearing aid.

2. Commissioner's Motion for Summary Judgment be GRANTED IN PART and DENIED IN PART for the same reasons set forth above.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

DATED: March 27, 2007

/s/ James E. Seibert
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE